**07 CV     6299**

# UNITED STATES DISTRICT COURT
## For The Southern District Of New York

|  |  |  |
|---|---|---|
| **COUNTER TERRORIST GROUP US,** *and* **J. K. IDEMA,** | ) ) ) | **COMPLAINT** |
| *Plaintiffs,* | ) ) | **(Jury Trial Demanded)** **Injunctive Relief Requested** |
| **v.** | ) ) | |
| **ASSOCIATED PRESS,** | ) ) | **Case # 07 CV _____** |
| **ASSOCIATED PRESS TV NEWS,** **PAUL HAVEN, STEPHEN GRAHAM,** **JASON STRAZZIO, AMIR SHAH,** **JOHN DOES 1-7,** | ) ) ) ) | **Assigned Judge _____** |
| *Defendants.* | ) ) | |

JUL 09 2007
U.S.D.C. S.D.N.Y.

**NOW COME,** Plaintiffs, and allege and say the following concerning Defendants, and each of them:

1.      This is a complaint for breach of contract, conversion, fraud, civil conspiracy, breach of confidence, interference with contractual relations, interference with prospective economic advantage, negligent misrepresentation, unfair and deceptive trade practices, defamation, copyright infringement, and contributory copyright infringement.

2.      Venue is proper in that Defendants have extensive commercial activities in this State and their principle place of business is in this district.  This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1332 in that the matters in controversy exceed the sum or value of $75,000, exclusive of interest and costs, and are between citizens of different states, as well as citizens or subjects of a foreign state.

3.      Over the past three years, Defendants have engaged in an ongoing pattern of disingenuous subterfuge, defamation, conspiracy, fraud, and copyright infringement. Defendants have intentionally and knowingly made, and caused to be republished by third parties, written and broadcast statements which were false or misleading, and in bad faith.

## PARTIES

4.    Plaintiff, Counter Terrorist Group US (Counterr Group) is a North Carolina company engaged in the support of US counter-terrorist initiatives, located in Cumberland County, NC.

5.    Plaintiff J. K. Idema is United States citizen formerly employed by the Counter-Terrorist Group, residing in New York.

6.    Defendants **ASSOCIATED PRESS, aka THE ASSOCIATED PRESS,** is, according to its website: "the backbone of the world's information system serving thousands of daily newspaper, radio, television and online customers with coverage in all media and news in all formats. It is the largest and oldest news organization in the world, serving as a source of news, photos, graphics, audio and video.  AP's mission is to be the essential global news network, providing distinctive news services of the highest quality, reliability and objectivity with reports that are accurate, balanced and informed. AP operates as a not-for-profit cooperative with more than 4,000 employees working in more than 240 worldwide bureaus. AP is owned by its 1,500 U.S. daily newspaper members." The Associated Press Defendant is located at 450 W. 33rd St. New York, NY 10001.

7.    **ASSOCIATED PRESS TV NEWS, aka AP TELEVISION NEWS**, is, according to their website, "the international television division of The Associated Press (www.ap.org), the world's oldest and largest newsgathering organization.  AP Television News is now the world's leading video news agency, delivering breaking global news, sport, entertainment, technology and human interest video content to broadcasters, online and mobile platforms. Video captured by AP Television News can be seen by over half of the world's population on any given day."

8.    **PAUL HAVEN,** was, according to his business card, the chief of Bureau for the AP in Pakistan.

9.    **STEPHEN GRAHAM,** was according to his business card, an AP correspondent in Afghanistan.

10.    **JASON STRAZZIO,** is upon information and belief, the current AP correspondent in Afghanistan.

11.    **AMIR SHAH,** is according to his business card, a correspondent for AP in Afghanistan.  Upon information and belief, Amir Shah is a former member of the Taliban, with continuing strong ties to the Taliban insurgency,[1] and has a strong bias against, and hatred for, Ahmad Shah Massoud's United Front Military Forces (commonly referred to incorrectly by the press as the Northern Alliance).

12.    **JOHN DOES 1-7,** are persons yet unknown whose identities are believed will be determined during the course of discovery.

13.    The Associated Press Defendants have a principle place of business in New York, New York, and owns Associated Press Television News.  The AP Defendants are collectively hereinafter referred to as "Defendants" or "AP."

---

[1] This is not uncommon with The Associated Press, several weeks ago the Pentagon said that an Iraqi photographer working for The Associated Press and held by the U.S. military since April was considered a security threat with "strong ties to known insurgents." Pentagon spokesman Bryan Whitman said there was sufficient evidence to justify the continued detention of Bilal Hussein, 35, who AP said was taken into U.S. military custody on April 12 in the Iraqi city of Ramadi and held since without charge. "All indications… received are that Hussein's detainment indicates that he has strong ties to known insurgents, and that he was doing things, involved in activities that were well outside the scope of what you would expect a journalist to be doing in that country," Whitman said. In three separate "independent objective reviews," Whitman told reporters, "it was determined that Hussein was a security threat and recommended his continued detention."

In another instance of Associated Press assisting insurgents; "September 09, 2006 Captured document: AP employee spied for Saddam"  Government Document ISGQ—2005—00026108 (http://70.168.46.200/Released/07—25—06/ISGQ—2005—00026108.pdf%3Cdiv%3E) dated July 25, 2000 was a secret report from an Iraqi Intelligence officer to different Iraqi Intelligence Directorates talking about information provided to them from a trusted source that works in the Associated Press (AP). The information was about the formation a newly formed UN weapons inspectors team called UNMOVIC. *Quoting:* "Secret / To: 5th / 4th / 13th Directorates / We were informed from one of our sources (the degree of trust in him is good) who works in the American Associated Press Agency that the agency broadcasted to through computer to its branches worldwide the following…"

## BACKGROUND FACTS

14.     In the 1980's Idema and Counterr Group assisted the United Front Military Forces (hereinafter the "UFMF"), often referred to improperly as the "Northern Alliance" by the press, in their struggle against the Soviets.  In 2001-2002, Idema was a military advisor to Commander Ahmad Shah Massoud's UFMF.

15.     Shortly after Massoud's assassination on September 9, 2001, and the subsequent September 11 attacks, Idema joined with the UFMF (*aka* Northern Alliance) in Northern Afghanistan and remained with their forces until June 2002, upon which time he returned to the United States.  He continued working with the UFMF and the transitional Afghan MOD (Ministry of Defence) in an advisory capacity.

16.     On July 5, 2004, Idema was captured by Karzai government forces during anti-terrorist operations on behalf of the United Front Military Forces and others.

17.     Thereafter, and throughout the following three years, Defendants committed the acts complained of herein.

## THE AUGUST 2004 ASSOCIATED PRESS AGREEMENT

18.     In July 2004, an Associated Press reporter in Kabul named Stephen Graham, along with an Afghan Associated Press reporter named Amir Shah, began writing the first stories to be released about Jack Idema and his team.

19.     In August 2004, two Associated Press reporters in Kabul met with Idema. One was the Bureau Chief named Paul Haven (hereafter "Haven") and the other was a former Taliban member named Amir Shah (hereafter "Shah").  They stated their purpose was to interview Idema regarding the arrest of the seven men in Afghanistan and "publish the truth" about the events.  Amir Shah's Taliban links were unknown to Plaintiffs at the time.

20.     During this meeting. Associated Press, through AP Kabul reporters Paul Haven and Amir Shah agreed that AP would not attempt to use or print or distribute any images which belonged to plaintiffs if Idema agreed to speak with them off the record.

Idema informed AP that they could obtain any photos they needed from plaintiffs' photo agency, Polaris Images in New York.  Further, when AP asked to photograph Idema he refused to allow it, again reiterating that any photographs required could be properly and legal licensed from Polaris Images.

21.    Both Haven and Shah agreed that if any photographs or videos or photographs made from videos were used or distributed, they would be licensed through Polaris Images.  This was a valid contract.  Defendants then engaged in the subsequent theft and conversion of Plaintiffs' photographs and videos and breached that contract.

22.    During this same time, Defendants assured Idema that they had not used any of his materials or images for any story.  This was an intentionally false statement, made to deceive, which did in fact deceive, and to which Idema relied on to his detriment.  At the time, Idema was in the NDS Saderat Interrogation Facility in Afghanistan, where he had been beaten and tortured.  He was not aware of the previous stories that AP had written, or the images that AP had used, nor did either Haven or Shah tell him this when Idema directly asked them.  Had Idema known the prior conduct of AP at the time, he would have acted differently.

23.    In fact, Haven and Shah repeatedly assured Idema that their stories had been favorable and reported the illegal events at the trial and the violations of Afghan law that occurred at during the July-September Afghan trial.  These were knowingly false statements meant to deceive which did in fact deceive.  Unfortunately, Idema had no possible way of knowing the falsity of these statements because at the time he could not even possess a blank piece of paper, no less a newspaper.

24.    In September 2004, Plaintiffs prepared a clip reel for release to the press which would prove defense statements made in the Afghan court.  The clip reel was designated the *Saber 7 Videotapes* and was made available to the Associated Press.  The clip reel stated on the cassette the name and phone number of plaintiffs' licensing agent, Polaris Images.

25.    Associated Press, and each of the Defendants, were aware that the *Saber 7 Videotapes* had to be licensed through Polaris Images and were aware that these images and

evidence were to be used to help fund a defense which ultimately exceeded $500,000. In fact, during the trial in Afghanistan, Idema had told the entire press corps, including Shah and Graham, that Polaris Images was the sole licensing agent for any photos of the group known as Task Force Saber 7, and that any image would have to be obtained and legally licensed from Polaris Images.

26.    Further, Associated Press, through AP Kabul reporters Stephen Graham, Paul Haven, Amir Shah, and others, both known and unknown, agreed to properly license ALL photos belonging to Plaintiffs, which was a contract, and therefore the subsequent theft and/or conversion, of Plaintiffs' photographs was not only a copyright violation, but a breach of contract, and in the case of the videotapes, a breach of implied contract and conversion.

27.    In or about October 2004, Associated Press correspondent Stephen Graham and Amir Shah, again met with Idema and requested to interview him. Idema declined the interview because he did not want to discuss the details of a trial *de novo* at that time, or reveal additional evidence that would be used in the second trial. During this meeting, Idema had repeatedly requested Haven, Graham, and Shah provide him with copies of articles they had previously written. They assured Idema that all of the AP articles had been fair and balanced and agreed, at Idema's request, to provide him with copies. During this meeting Idema specifically asked Defendants who had written the false statement which was reprinted throughout the world, alleging that Idema had hung innocent Afghan men upside down in a basement and tortured them. Shah, Graham, and Haven all stated they did not know, but that they had also read that but did not believe it. In fact, Haven and Shah had previously told Idema that they had been to the Task Force Saber compound in Kabul and found no evidence of anyone ever hanging upside down, torture, or other crimes alleged. Further, they freely admitted that there was no basement in the house and that the allegation of men hanging upside down in a basement was obviously false. When Idema asked them to please try and find out who wrote it, both Haven and Shah assured Idema that they would research it and let him know.

28.     Years later, when Idema did obtain copies of the original articles, he was shocked to learn that in reality, it had been Haven and Shah that had fabricated those statements using an anonymous source in violation of AP policy.  Upon information and belief, at least one anonymous source quoted by AP, and re-quoted and republished around the world even to this day, was not just non-existent, but a figment of Amir Shah's imagination as explained in more detail hereafter.

29.     Further, in September 2004, when AP received the *Task Force Saber Videotapes* from an attorney, AP agreed that the video Plaintiffs supplied them would be off the record and used only for corroborating statements made in court.  It was also agreed that Associated Press would NOT use any photos or video without Plaintiffs' written permission or a proper license from Polaris Images in New York, nor would Defendants provide the video to third parties or AP clients for broadcast.  Associated Press has repeatedly printed statements made "off the record" in their articles and distributed the confidential videotape to third parties in further violation of contracts, breach of confidentiality agreements and in breach of confidence.

30.     Because Associated Press agreed to pay for the photographs and videos prior to publishing, and at no time was the right to re-sell Plaintiffs' protected images ever agreed to, there was also a conversion of Plaintiffs'' property by the AP Defendants.  Further, Idema personally and repeatedly informed AP that they would not be able to re-sell or distribute ANY of plaintiffs' proprietary materials such as photographs and video which belonged to Plaintiffs.  Associated Press agents assured Idema that this would not be done, and therefore engaged in fraud and unfair and deceptive trade practices[2] as the statement was not only made with intent to deceive, but knowingly false.  In fact, AP had already committed the acts they were stating they would not engage in—using the images without licensing them and distributing the images in violation of the agreements, and concealing

---

[2] This North Carolina State cause of action is not preempted by the Copyright Act because it requires an extra-element, beyond mere copying, preparation of derivative works, performance, distribution, or display, and therefore the state action is qualitatively different from, and not subsumed within a copyright infringement claim and therefore not preempted by federal law.

this wrongful conduct with the intent to deceive, and which did in fact deceive, in furtherance of their conspiratorial enterprise.

31.    The *Task Force Saber Videotapes* were supplied to Associated Press in confidence,[3] and it was agreed in advance that the videos were being provided in confidence until such times as they were properly licensed for broadcast.

32.    It was further agreed that the proprietary nature of the tapes would be protected by all parties, and that viewing was for the sole purpose of confirming Plaintiffs' statements to AP reporters, NOT for distribution or sale to AP clients.  The intent and purpose of this agreement, which was clearly agreed to by all parties, was to prevent the unauthorized release of exhibition of Plaintiffs' photos and video images.

33.    What was particularly egregious in this instance, was that while AP was selling the video and profiting from its distribution, at the identical time AP correspondents who had seen it were intentionally omitting the exculpatory nature of the video from their stories, continuing to propagate the vicious myth that Idema had been hanging Afghans upside down in a non-existent basement and torturing them.  This was remarkably similar to the conduct of journalists who false claimed Korans had been flushed down toilets by American soldiers at GITMO, Cuba.  In sum, it was a complete fabrication of facts and events born from the imagination of a questionable journalist with no formal training.

34.    In August 2005, Plaintiffs first learned of the illegal distribution of their images and Defendants' violation of their agreements.  On or about August 25, 2005, Idema wrote to the General Counsel of Associated Press requesting that this conduct cease and that the photos and tapes be returned.  AP refused to return the images, but did offer a token licensing fee of $15,000 which was rejected.  Although the offer was rejected AP never returned Plaintiffs' materials, and, upon information and belief, has continued their distribution and use to this day.

---

[3] Unlike a violation for copyright infringement, this claim for breach of confidence is predicated on a violation of trust or confidence—a breach of confidentiality, related to but distinguishable from a trust relationship, which is exempt from preemption because this breach of confidence claim involves an additional element.

35.     Additionally the August 2005 letter from Idema put Defendants on notice that litigation would be forthcoming and made a clear and plain demand that Defendants preserve all "notes, conversations, tapes, and/or documents, including emails" and that "[d]ocuments, evidence, or materials in the possession of Associated Press or your agents. Reporters, or employees, and/or related person or entities, is hereby asserted to be discoverable evidence."

36.     In spite of the fact that the letter stated, "…this letter is to inform you that these evidentiary materials must be preserved until such time as litigation is concluded, and are not subject to any document destruction procedure or policy your organization may have or may institute in the future until such time as your receive written notification from me that all related litigation has ceased," upon information and belief, AP and several of AP's reporters, destroyed documents, evidence, and emails.  This spoiliation included, but was not limited to, the destruction of emails and photographs from Joseph Cafasso, an AP source who has fraudulently misrepresented himself as, among other false identities, both a US Army Delta Force Colonel with numerous Silver Star awards for heroism, and a CIA agent who was working for the White House.  The AP Defendants should have known that Cafasso was a fraud, because the NY Times had previously run a story exposing Cafasso (*The Colonel Who Wasn't* – Jim Rutenberg, April 29, 2002).  The emails destroyed contained evidence of the fabrication of events, theft of images, illegal access to private email accounts, and conspiracy to infringe copyrights and violate property rights.

37.     This destruction of notes, conversations, tapes, and/or documents, including emails was in violation of law and intentionally meant to conceal evidence of wrongdoing by the AP, and their agents, which constituted the spoliation of evidence and an obstruction of justice.

38.     Over the past three years, starting in or about August 2004, Defendants have wantonly, knowingly, and repeatedly, violated their agreements to the detriment of Plaintiffs by distributing Plaintiffs' photographs and video images on APTN and through the AP, for which they are liable for that distribution in violation of Defendants' verbal and express contracts.

39.     Over the past three years, starting in or about July 2004, Defendants have wantonly, knowingly, and repeatedly, published intentionally false or misleading statements to the detriment of Plaintiffs, for which they are liable for that distribution in violation of Defendants' verbal and express contracts.

40.     Further, that these vicious and false accusations of horrific conduct by the AP, conduct which was completely fabricated and fictional, have been, and are still being, republished in thousands of articles, internet sites, and web blogs throughout the world.

## THE ILLEGAL ASSOCIATED PRESS VIDEO FEEDS

41.     The Associated Press repeatedly distributed pictures and video belonging to Plaintiffs.  These "video feeds" were distributed by Associated Press and Associated Press Television Network to their clients throughout the world and continue to be distributed. While the entire scope of those distributions and uses, along with the extent of contract violations and breaches of confidence are unknown, Plaintiffs have currently obtained evidence of two instances, one which occurred on July 14, 2004, and the second which occurred on September 15, 2004.

42.     On or about July 14, 2004, Defendants sent out a video feed from Kabul Afghanistan. Upon information and belief, it was fed by satellite to one of the APTN offices.  Also upon information and belief, that video was either assembled by one of the individual Defendants, or at the direction of Haven, Graham, or Shah, by an AP cameramen, and contained the first evidence of Defendants' wrongful use of Plaintiffs' still pictures in violation of the contract and in violation of copyright.  That AP video was "slugged" (labeled) as follows:

| | |
|---|---|
| Story Name: | Afghan US Vigilantes |
| Dateline: | Kabul- 14 July 2004/File |
| Type: | English/Nat |
| Duration: | 03:10 |
| Restrictions: | APTN Clients Only |
| Story Number: | 422563 |
| Source: | APTN |

43.    Plaintiffs' pictures which were placed on the AP video included: a) a Desert Patrol picture of Jack Idema and two of his Panjshir commandos taken in the Mazar-i-Sharif area, b) a picture of Jack Idema on a Northern Alliance tank with NYPD painted on the barrel taken during the battle of Tora Bora, and c) a picture of Jack Idema riding a Bamian cavalry horse during the 2001/2002 war.  Each of these photographs were copyrighted at the time.

44.    On or about September 15, 2004, Defendants sent out another video feed from Kabul Afghanistan.  Upon information and belief, it was also fed by satellite to one of the APTN offices in either London, Washington, or New York.  Upon information and belief, that video was also assembled by one of the individual Defendants, or at the direction of Haven, Graham, or Shah, by an AP cameraman, and contained the second evidence of Defendants' wrongful use of Plaintiffs' still pictures in violation of contract and copyright.  That AP video was "slugged" as follows:

| | |
|---|---|
| Story Name: | Afghan US Vigilante Wrap |
| Dateline: | Kabul- 15 Sep 2004 |
| Type: | Dari/English/Nat |
| Duration: | 02:56 |
| Restrictions: | APTN Clients Only |
| Story Number: | 428018 |
| Source: | APTN |

45.    On this video feed, Defendants placed portions of Plaintiffs' *Task Force Saber Videotapes* which were given to Associated Press in Kabul.  However, the video had been severely edited and re-cut to make it appear as though it was actual Associated Press video, and was then distributed to Defendants' clients for profit.

46.    Upon information and belief, these were not the only videos sent to Defendants' clients by Associated Press which contained images belonging to Plaintiffs and were a violation of the contracts and confidentiality agreements between Plaintiffs and Defendants.

47.    In Idema's August 2005 letter to the Associated Press he outlined these violations.  Associated Press responded by saying "The videotape to which Mr. Idema

refers in his letter was handed out to news organizations by his attorneys, who urged that it be distributed as widely as possible.  AP used the tape in the good faith belief that it was authorized to do so."  This feeble attempt to alter the record of events was one more in a long line of false statements by Defendants.  Further, even after being put on notice, Defendants have continued to sell and distribute the images on that video to documentary companies, news organizations, and their clients, thereby converting it to their own use.

48.    In Defendants' "clip reel" offered for sale, sold, and republished, The Associated Press left out, and continues to leave out, all photo credits for these photos and videos.  This failure to credit photos is an intentional effort to conceal Defendants' copyright violations, and *prima facie* evidence of fraud and malicious intent.

## SPECIFIC IMAGES – WRONGFUL USE

49.    Some of the known wrongful uses related to specific images is as follows:

49.1.    *Picture of Jack Idema walking in the Mazar desert with two Afghan Northern Alliance commandoes during the 2001 war in Afghanistan.*  This photo was of extraordinary value and was only for release under a very specific set of contractual terms.  Plaintiffs hold multiple copyrights regarding this picture, including holding the copyright on the actual front cover of *The Hunt For Bin Laden* book where it was taken from.  When Associated Press was unable to license the photo through Polaris Images, they not only published the photo and ignored all rights and privileges which were intentional and knowing violations of law, but they also began selling it to third parties.  Further, Defendants made a derivative work in violation of the owner's rights by cropping the picture, deleting the cover art, and zooming in on Idema.

49.2.    *Picture of Jack Idema on an Afghan Tank in Tora Bora with NYPD painted on the tank's barrel.*  This picture, taken in December 2001 was not provided to Associated Press by either Idema or Polaris; it was simply stolen. Not only did Defendants violate the copyright by publishing it, but they also contributed to copyright infringement by distributing it to their clients.

49.3.    *Picture of Jack Idema riding a Bamian Cavalry horse during the 2001/2002 war in Afghanistan.*  Like the previous photo, this photo was also of extraordinary value and was only for release under a very specific set of contractual requirements. Defendants publishing and republishing of this photo was a violation of copyright law, and far beyond the limits of fair use.

49.4.    *Videotape of Jack Idema and Task Force Saber.*  Like the images above these videos were of extraordinary value and were only for release under a very specific set of contractual requirements to be negotiated with Polaris Images.  The *Task Force Saber Videotapes* were specifically given to AP for the sole purpose of using them to verify claims in court by Idema, and to quote in <u>written</u> articles.  There was never any agreement that the video or video still grabs could be used or distributed and sold to clients, and in fact there was an agreement to the contrary, that the images would not be published.

50.    AP continues to violate their agreements and Plaintiffs' copyrights, causing significant financial damage to Plaintiffs.  AP has been repeatedly informed of their wrongful acts in writing and yet AP continues to ignore and violate the agreements, intentionally refuses to respond to Plaintiffs' request to cease their continued violations, and intentionally continues to engage in the wrongful conduct complained of herein

## AP'S REPEATED VIOLATIONS OF THE COPYRIGHTS

51.    As soon as the Idema story broke in or about July 6, 2004, Defendants began repeatedly violating Plaintiffs' copyrights and distributing Plaintiffs' images.

52.    First, Defendants knew that Plaintiffs' photos were being licensed through Polaris Images in New York.

53.    Second, Defendants and Plaintiffs engaged in conversations about licensing images and videos from Polaris Images, and Defendants had previously inquired into licensing those images prior to their wrongful use.  Therefore, Defendants made a conscious and knowing decision to forgo proper licensing and simply steal the images.

54.    Third, Defendants intentionally and knowingly concealed the source of the photos by omitting photo credits and marks to conceal their theft.

55.    Fourth, Defendants intentionally cropped and altered still photographs to conceal their source and credits.

56.    Fifth, Defendants knowingly published images that were being reserved for an exclusive story rights sale, thereby depriving Plaintiffs of substantial income which could have been used for Idema's legal defense.

57.    Sixth Defendants had a responsibility to properly license the images, to know copyright law, and to correctly report the facts and refrain from those intentional copyright violations which Defendants engaged in.

## AP'S REPEATED VIOLATIONS OF THE AGREEMENTS

58.    In return for meeting with Idema personally, Associated Press correspondent Stephen Graham agreed to provide copies of "each and every AP article and story" to Idema.  Yet Associated Press never provided a single article or story.  Upon information and belief, this was intentionally designed to conceal ongoing breaches of contract, fraud, defamation, and other wrongful acts by Defendants.

59.    Associated Press agreed that any still pictures from the *Saber 7 videotapes* or belonging to Idema would be purchased through Polaris Images and would bear the Polaris Images logo.  Yet AP simply distributed and sold Plaintiffs' property to their clients and failed to ever place the Polaris Images logo on those pictures in order to fraudulently mislead their clients into believing that the images and video were the property of The Associated Press, thereby costing Plaintiffs valuable licensing fees from third party licenses which could have been used for Idema's defense in Afghanistan.

60.    Further, by intentionally distributing Plaintiffs' *Task Force Saber videotapes* with neither the APTN logo or the Polaris Images logo embedded, AP allowed other news organizations and third parties to gain access to clean footage thereby making it virtually impossible to protect from other third party use or theft.

61.    Defendants also agreed to direct requests for images and video to Polaris Images.  Yet over the course of three years AP s never directed a single request to Polaris Images or to Plaintiffs, even though third parties actually made requests to AP.

62.    Since July 14, 2004, AP has arbitrarily, capriciously, and repeatedly used, distributed, and sold Plaintiffs' photos and *videotape* footage to AP clients as if it was their own, and exercised property rights and ownership in violation of the agreements apparently relying on the hope that if Idema remained in an Afghan prison for twenty years he would be unable to engage in legal recourse against these Defendants.

63.    In answer to Idema's August 2005 letter to Tom Curly, Chief Executive Officer at The Associated Press, the AP responded by saying Idema's attorneys had given permission to the AP to use the videotape, and that they would "research" the use of Plaintiffs' still photos.   The AP never followed through with that promise, and failed to ever respond again.

64.    Associated Press did not advise Plaintiffs of the other uses, simply taking the position that as long as they were not caught, they did not have to address those issues or admit to additional wrongful uses.

65.    Defendants intentionally misreported the facts of stories and used questionable sources which they knew were reporting false information.

66.    Defendants knowingly and negligently republished these false statements with a reckless disregard for the truth and used Plaintiffs' stolen images to distribute those false statements and aid their fraud.  The stolen images gave the impression that Defendants had exclusive, special access, insider knowledge of the story.  By illegally using those images Defendants were able to make their stories appear as though they were credible and true.

67.    The purpose of this false reporting was to assert dominion and control over images which Defendants could profit from and intentionally raise the controversy surrounding the events and turn the story into a torrid tale of torture and crime which Defendants could thereby profit from both financially and politically.  As an example, by reporting the horrifying story of innocent Afghans hanging upside down in a basement

littered with bloody cloth, AP insured a huge profit margin on the story during a time when news reporting in Afghanistan was at an all time low.  During this time, former Taliban member, and certainly a continuing Taliban sympathizer, Amir Shah, who had a vendetta against Massoud's United Front Military Forces, was able to use the false statements to undermine the US allied relationship with the United Front, lift his sagging profits as an AP reporter, and raise his international profile, thereby profiting from his intentionally false statements. At the same time, by disseminating what at least four Afghan high court and appeals court judges later called "propaganda" and "lies," Shah, and the other AP correspondents involved, were able to wrongfully use and sell a wide variety of Plaintiffs' images and documents without fear of reprisal believing that Idema would be imprisoned for many years, certainly longer than the statute allowed for filing of civil actions in U.S. courts.

68.     To this end, Shah, and others, both known and unknown, entered into a conspiratorial enterprise, the purpose of which was to create a story so shocking, and so vicious, that it would encircle the globe in one of the largest and far-reaching stories related to the War on Terror in 2004.  A story which although completely false, altered foreign policy and the Pentagon's strategic plan against terrorism in Afghanistan.  The false accusations against Idema and his men were, upon information and belief, a carefully engineered propaganda campaign covertly orchestrated by Shah on behalf of his terrorist co-conspirators to release those terrorists which plotted to, and later succeeded, in altering the political course of Afghanistan through assassinations, bombings, and murder.  Shah's conspiracy with *al-Qaida* resulted in the deaths of hundreds, if not thousands, of innocent people through their bombing rampage.

69.     This conspiratorial enterprise is further addressed herein, and was also responsible for tens of thousands of false articles and reprints throughout the world which continue to this day.

## INTENTIONAL WITHHOLDING OF EXCULPATORY EVIDENCE AND RECKLESS DISREGARD FOR THE TRUTH

70.    In April 2004, Idema's counter-terrorist team, known as Task Force Saber, and later TF Saber 7, was back in Afghanistan again working closely with U.S. and Afghan military and intelligence activities.

71.    All of Idema's team members were officially employed by the Ministry of Defense or Afghan CIA, except one, who was an Emmy award-winning journalist who had worked for AP, ABC, NBC, and CNN, now working as an embedded journalist with Task Force Saber a story about the *al-Qaida* terrorists in Afghanistan, the Taliban infiltration of the new government, and the ineffectiveness of conventional military operations against the growing terrorist resistance and attacks.

72.    In June 2004, Idema and his team had captured the brother-in-law of bin Laden's chief of security and the terrorists responsible for the murder of Canadian ISAF Corporal Jamie Brendan Murphy.  Corporal Murphy had been murdered in a bombing on Darlaman Road in Kabul on January 27, 2004.  Upon information and belief, AP had been tipped by an unknown source in the Afghan National Security Council, one of only three organizations that actually knew the daily details of Idema's operation.

73.    AP tried to contact Idema about the story but was told that approval for the story would have to be obtained from the Department of Defense before Idema could discuss his relationship with Bagram or Task Force 180.

74.    On July 5, 2004, Idema was arrested by anti-UFMF forces.  It has since been learned that this was orchestrated by Interior Minister Ahmad Ali Jalali, a U.S. citizen, Amrullah Saleh, Chief of the Afghan NDS (secret police), also a U.S. citizen, and other persons, both known and unknown to, among other things, prevent the exposure of a plot to assassinate Hamid Karzai's primary political opponents who were former U.S. allies. Idema and his team were falsely accused of "running a torture chamber," "torturing innocent Afghans," and other illegal conduct, supposedly by Ahmad Ali Jalali.  Three other false claims allegedly made were that Idema had "innocent Afghans hanging from the ceiling in his basement," that the terrorists were being "abused, tortured, and starved," and

that Idema and his men were simply "rounding up innocent Muslims with long beards" (only 3 of 11 had any beards at all).

75.    AP reported Jalali's false and fabricated claims and similar false allegations by Jalali's spokesman Lutfullah Mashal. Ahmad Ali Jalali was a former *Voice of America* radio news translator in Washington, DC. Jalali, a vehemently anti-UFMF (Northern Alliance) Pashtun from the south, is alleged to have had a prior relationship with AP News, FOX News, and other news agencies. AP News had also worked with Lutfullah Mashal in the past. Mashal was a former translator for journalists during the 2001/2002 war and had close connections with the Taliban. Idema had warned several news agencies about Mashal's Taliban connections in 2001 and 2002 yet they still employed Mashal and worked with him during that time.

76.    In 2003, Jalali left his job as a "journalist" and was appointed Minister of Interior for Afghanistan, thereafter appointing Lutfullah Mashal as his Ministry of Interior spokesman. Jalali and Mashal continued to maintain a close relationship with AP News, and other press agencies such as CBS and FOX. Jalali resigned in 2006 and fled Afghanistan, as did Mashal.

77.    In spite of the fact that AP knew the allegations by Jalali and Mashal were completely false, AP still reported these false claims. AP had information disproving the false allegations yet intentionally and knowingly withheld this information from their reporting. As an example, the AP Bureau Chief had entered Idema's compound and was thus aware that there was NO basement and no evidence of anyone ever being hung upside down or any other way—so therefore, any claims that terrorists "were hanging from the ceiling in a basement" or "by their feet in a basement" were made negligently and with reckless disregard of the truth. AP also had eyewitness and video evidence directly refuting the charges that ANY terrorists were hanging from anything. Furthermore, AP had either actual disbelief or serious doubts that any torture had been conducted. AP had seen Idema's questioning techniques on video and level of terrorist cooperation during the questioning and was aware there was no torture being conducted. AP also had knowledge that these "innocent Afghans" were in fact terrorists. AP had videotapes in their possession

that confirmed, among other things, that: a) the detainees were terrorists, b) there was no torture, and c) Idema and his men were innocent of the false charges alleged.

78.    AP withheld this exculpatory information and continued to falsely report the same story of mythical torture; rooms littered with non-existent bloody cloth, and fabricated tales of boiling water, and ludicrous fictional accounts of a *Marquis de Sade* torture chamber which other new agencies and internet sites then republished throughout the world and have continued to republish time and again throughout the last three years and even now.  AP published those false, and in many cases completely fabricated statements about Idema negligently and with a reckless disregard for the truth.  AP withheld exculpatory evidence which would have aided Idema and his men who had been falsely accused of horrific crimes.  Upon information and belief, AP editors and at least two of the individual Defendants and decided that the "torture version," regardless of how disingenuous it was, was in line with AP's Abu Ghraib reporting and therefore a better story for AP.

79.    This withholding of information and knowingly false reporting by AP caused other news agencies to continue to rely on false information and AP's anonymous sources instead of facts and AP intentionally concealed the identity of those sources so they could not be refuted or disputed, and/or, in at least one case, proven to be fictitious and non-existent.  One of AP's anonymous sources was Mashal, who Carlotta Gall at the NY Times described as the most unreliable source in Afghanistan and who Gall stated had "repeatedly lied" to her.  Mashal's unreliability was widespread knowledge and defendants not only knew Mashal was an unreliable source, but were in possession of actual evidence completely contradicting Mashal's statements to AP.

80.    Because AP employees had physically gone into the Task Force Saber compound, AP knew that statements about the conditions there were also false.  Yet, AP, negligently and with reckless disregard for the truth, falsely reported the story and published statements AP knew were false, misleading, and defamatory.

81.    By falsely reporting the events in the case against Idema and his team, AP stood to profit immensely.  In essence, AP needed a hot salient and torrid story of abuse in

Afghanistan to compete with CBS' scoop on the Abu Ghraib incidents. To meet this need, AP created their own exclusive torture story; the completely fabricated story of Jack Idema's non-existent torture chamber, in a non-existent basement.

82.    AP had a duty to disclose the exculpatory information they withheld and to include this information in each and every one of their news reports about plaintiffs.

83.    Defendants acted wrongfully and engaged in defamation, libel, slander, and libel *per se*, by negligently and recklessly republishing false statements by Mashal, Jalali, terrorists, fictitious non-existent sources, and others, which AP knew firsthand to be false, and in some cases, were the fabrications of Amir Shah's vivid imagination.

## DEFENDANTS' USE OF "ANONYMOUS" SOURCES

84.    According to Bobbie Jo Buel, chair of The Associated Press' Managing Editors (APME) Credibility Committee and executive editor at the *Arizona Daily Star,* the AP knew it had a problem with anonymous sources and the credibility of the information those sources provided, and had policies in place for their use:

> "When APME credibility committee members met in Louisville last fall, we all complained about unnamed sources in wire copy. It seemed to us that federal employees and national politicians hide under a blanket of anonymity that newspapers would never permit state house or city hall officials to use.
>
> Wouldn't readers be interested in knowing their [anonymous sources'] motivation?"[4]

85.    Realizing the problem with anonymous sources, The Associated Press put in place a policy to deal with their use. However, in this case, the policy was completely ignored:

**"AP statement on anonymous sources**

*The following section on the use of anonymous sources is from a "Statement of News Values and Principles" being developed by AP:*

---

[4] http://www.apme.com/committees/credibility/052705unnamedsources.shtml

Transparency is critical to our credibility with the public and our subscribers. Whenever possible, we pursue information on the record. When a newsmaker insists on background or off-the-record ground rules, **we must adhere to a strict set of guidelines, enforced by AP news managers.** Under AP's rules, material from anonymous sources may be used only if:

1. **The material is information and not opinion or speculation,** and is vital to the news report.

2. The information is not available except under the conditions of anonymity imposed by the source.

3. **The source is reliable, and in a position to have accurate information.**

Reporters who intend to use material from anonymous sources **must get approval from their news manager before sending the story to the desk.** The manager is responsible for vetting the material and making sure it meets AP guidelines. The manager must know the identity of the source, and is obligated, like the reporter, to keep the source's identity confidential. Only after they are assured that the source material has been vetted should copy editors allow it to be transmitted.

Reporters should proceed with interviews on the assumption they are on the record. If the source wants to set conditions, these should be negotiated at the start of the interview. At the end of the interview, the reporter should try once again to move some or all of the information back on the record.

Before agreeing to use anonymous source material, **the reporter should ask how the source knows the information is accurate, ensuring that the source has <u>direct knowledge</u>.** Reporters may not agree to a source's request that AP not pursue additional comment or information.

The AP routinely seeks and **requires more than one source**. Stories should be held while attempts are made to reach additional sources for confirmation or elaboration. In rare cases, one source will be sufficient — when material comes from an authoritative figure whose detail makes it clear and certain that the information is accurate.

**We must explain in the story why the source requested anonymity.** And, when it's relevant, we must **describe the source's motive for disclosing the information**. If the story hinges on documents, as opposed to interviews, the reporter must describe how the documents were obtained, at least to the extent possible.

The story also must provide attribution that establishes the source's credibility; simply quoting "a source" is not allowed. **We should be as descriptive as possible: "according to top White House aides" or "a senior official in the British Foreign Office."** The description of a source must never be altered without consulting the reporter.

When appropriate, attribution in the lead should read, "The Associated Press has learned," to be followed by more specific attribution in the next paragraph. This construction must be used only for rock-solid information from reliable sources, or where the AP has obtained authoritative written documentation.

We must not say that a person declined comment when he or she is already quoted anonymously. And we should not attribute information to anonymous sources when it is obvious or well known. We should just state the information as fact.

Stories that use anonymous sources must carry a reporter's byline. If a reporter other than the bylined staffer contributes anonymous material to a story, that reporter should be given credit as a contributor to the story.

And all complaints and questions about the authenticity or veracity of anonymous material — from inside or outside the AP — must be promptly brought to the news manager's attention.

Not everyone understands "off the record" or "on background" to mean the same things. Before any interview in which any degree of anonymity is expected, there should be a discussion in which the ground rules are set explicitly.

These are the AP's definitions:

On the record. The information can be used with no caveats, quoting the source by name.

Off the record. The information cannot be used for publication.

Background. The information can be published but only with the conditions set forth by the source. Generally, the sources do not want their names published but will agree to a description of their position.  AP reporters should object vigorously when a source wants to brief a group of reporters on background and try to persuade the source to put the briefing on the record. These background briefings have become routine in many venues, especially with government officials.

Deep background. The information can be used but without attribution. The source does not want to be identified in any way, even on condition of anonymity.

In general, information obtained under any of these circumstances can be pursued with other sources to be placed on the record.

**ANONYMOUS SOURCES IN MATERIAL FROM OTHER NEWS SOURCES:**

Reports from other news organizations based on anonymous sources require the most careful scrutiny when we consider them for our report.

AP's basic rules for anonymous-source material apply to pickups as they do in our own reporting: The material must be factual and obtainable no other way. The story must be truly significant and newsworthy. Use of sourced material must be authorized by a manager. The story must be balanced, and comment must be sought.

**Further, before picking up such a story we must make a bona fide effort to get it on the record, or, at a minimum, confirm it through our own sources. We shouldn't hesitate to hold the story if we have any doubts.** If the source material is ultimately used, it must be attributed to the originating member and note their description of their sources."[5] [All emphasis added]

86.    In July 2005, The Associated Press, fully aware of its problem with anonymous sources, put out a memorandum to its staff, again outlining the use of unnamed sources. In spite of that July 2005 warning, Defendants repeatedly continued to violate the policy and reprint information which was false and defamatory, causing that information to be reprinted time and again around the globe through Defendants' vast global news network. The letter from the AP stated, in part:

**"AP reminds staff about policy**

*June 17, 2005*

Dear AP Staffers:

There is deep concern throughout our industry about anonymous sources and the ways in which their misuse undermines our credibility as journalists.

The recent Newsweek story and revelations about Deep Throat have kept the issue front and center on the minds of editors. In a **survey last week** by AP and APME, editors of 100 out of 400 newspapers who responded said they ban all use of anonymous sources by their staffs. And many of those that do permit it are tightening their restrictions.

AP has long had an **excellent policy on anonymous sources** that has set the standard for the rest of the news media. It will be included in full in the forthcoming Associated Press Statement of News Values and Principles. A copy is attached at the bottom of this note and it's also appended to this e-mail as an attachment.

The rules serve us well when we enforce them strictly. But, too often, we're finding that staffers are not familiar with them: They haven't read the policy; they haven't discussed it; sometimes, they have forgotten it.

In some quarters, there is a mistaken notion that using anonymous sources adds an air of exclusivity to our reporting and makes it seem more like a scoop. Some people think when we talk about our journalists doing "source reporting" that we expect or even prefer these sources to be anonymous in our copy.

Nothing could be further from the truth.

---

[5] (http://www.apme.com/committees/credibility/052705anonymous.shtml)

A story that identifies its sources is a better piece of journalism, more complete and more credible, than the very same story pegged to unnamed sources.

When we develop relationships with sources, it must be clear to them that our strong preference is always to be able to quote them on the record, by name…

Furthermore, when we meet resistance from the source to using his or her name, our job as journalists is to push back, to fight hard to avoid having to resort to anonymity.

Washington CoB Sandy Johnson has made that bureau a leader in the campaign to pressure government officials to go on the record for briefings that now are routinely conducted under cloak of anonymity. We should carry that fight to other locations.

If we fail to change a source's mind, then we need think hard about whether the material is important enough to justify using it in the story. It may well be that the answer is no.

And when we do put anonymous material on the wire, our policy says that we must describe for the reader why a source insists on going unnamed.

Without this explanation, the granting of anonymity starts to appear casual and routine.

We are sending this note to every AP employee because this issue is so important to our industry.

Every journalist in the company should study the policy. Even if you have read it in the past and think you know it, please go over it again now, word for word. Make copies. Keep them handy in the office. Managers in all bureaus and departments will be arranging sessions for staffers to discuss the rules thoroughly with their colleagues and to resolve any questions. It's essential that everyone develop a sense of ownership of and commitment to this policy.

We hope that those of you who work in departments other than news will also take the time to read the policy and that you will take pride in knowing you work for a company that cares deeply about this vital issue.

Thank you,

**Mike Silverman**
AP Managing Editor

**Kathleen Carroll**
AP Executive Editor"[6]

---

[6] http://www.apme.com/committees/credibility/061705apletter.shtml

87.    AP' internal regulations and newsgathering guidelines lay out specific requirements for the use of unnamed anonymous sources, all of which AP failed to adhere to.  In sum, Defendants knowingly printed false statements, and concealed the source of those false statements, because had the source been known, the statement could never have been printed, for it was completely fabricated.  Bobbie Jo Buel, Chair, APME credibility committee, stated that:

> "Make sure sources know what will happen if they're dishonest. The *Miami Herald* advises, "Sources should know they're expected to deal honorably with the newspaper. If the source knowingly gives false information for publication, the commitment to confidentiality dissolves."

> Finally, consider this blunt opening statement in the *The Washington Post*'s policy: "When we use an unnamed source, we are asking our readers to take an extra step to trust the credibility of the information we are providing. We must be certain in our own minds that the benefit to readers is worth the cost in credibility."[7]

According to the AP's Managing Editor website:

> "Over the last 10 years we have not used a single anonymous source," said Ana Walker, editor of the Longview (Texas) News-Journal. "We might as well be writing fiction if we cannot give our readers a source."[8]

But that is precisely what The Associated Press did, and continues to do to this day, write fiction.  Fiction that is so damaging and so horrific, that it has been reprinted around the world time and again for three years in tens of thousands of forums, television, newspapers, magazines, web blogs, internet chat rooms, reports, surveys, and books, in more than 20 languages.  The description of innocent men, hanging upside down in a bloody basement, is perhaps the most shocking revelation of inhumanity in the War on Terror since its beginning.  Who was responsible for this fiction that traveled the world?  At the creative level, it was two AP reporters, one of which is linked to the Taliban in Afghanistan and who is vehemently anti-US and anti-liberty forces Islamic fundamentalist—Amir Shah.  At the managing level, it was at a minimum, Haven, and other AP Bureau Chiefs.

---

[7] http://www.apme.com/news/2005/060805anonymous.shtml
[8] http://www.apme.com/news/2005/060805anonymous.shtml

88.     The Fair Report privilege does apply to an illegal Afghan Court, and certainly not statements made outside the official court proceedings.  Here, the statements printed by Defendants, alleging extreme torture, beatings, immersion in boiling water—without so much a single mark on any terrorist as evidence of this extreme abuse, men hanging upside down from ceilings in a non-existent basement, and other unsupported nefarious conduct, were not contained in any official report. They were not made at any official press conference or during testimony. They were made by a Minister of Interior, his spokesman— both having had financial relationships with The Associated Press, and an "anonymous source" – none of which were involved in the indictment, prosecution, or trial, a fictitious source fabricated by Shah, and others not protected by an Fair Report privilege. In fact, the Minister of Justice, Abdul Kareem Karimi, discounted all of these statements within days, saying they were "simply not true."  AP intentionally withheld this.

89.     Defendants' statements imputed far more serious conduct than the actual charges reflected, and were not based on any official report, because there was no such report. Further, Defendants had individual specialized knowledge that the torture statements were not true, they had interviewed people who had been in the compound during the time the events allegedly occurred and stated the allegations were false.

90.     One of the most remarkable examples of tainted and twisted reporting occurred just recently in June 2007, when Jason Strazzio and the AP reported their version of the circumstances surrounding the release of Idema.  AP offices had been tracked logging onto websites where videotape evidence in a Washington DC federal *habeas corpus* action was placed for the court and on an internet blog where the videos of five Afghan judges were posted.  The videotapes showed Afghan judges repeatedly stating that Jack Idema was innocent.  AP staff spent dozens of hours reviewing the tapes.  In fact, one AP editorial office spent a total of 19 hours watching the tapes and re-playing the tapes time and again.  Yet when AP wrote their article the following day, calling Idema a fraudster, not once did they make mention of a single videotape where Idema was pronounced innocent by Afghan high court judges, nor did AP, although they read each of them, ever quote from a single affidavit filed by more than 20 Afghan officials discussing

Idema's innocence or the true nature of the case.  Instead, AP let Amir Shah, a known Taliban sympathizer, if not supporter or current member, write the stories which continued false and misleading dissertations of the events and facts, and were designed to continue Defendants' brutal personal attacks against Idema, and continue to conceal Defendants' originally false and fabricated reporting.

### DEFENDANTS' UNAUTHORIZED DISTRIBUTION OF PLAINTIFFS' *Task Force Saber Videotapes*

91.    AP, through their actions in distributing *Task Force Saber Videotapes* to third parties, and by failing to place a logo or disclaimer over Plaintiffs' *Task Force Saber Videotapes* has assisted third parties in illegally using and pirating Plaintiffs' *Task Force Saber Videotapes*.  AP' distribution of the *Task Force Saber Videotapes* in violation of their agreements enables, materially contributes to, and induces the unlawful use of Plaintiffs' videotapes and images.

92.    The illegal distribution of Plaintiffs' *Task Force Saber Videotapes* and photos has facilitated, induced, profited from, and enabled others to profit from the unlawful possession, viewing, and use of Plaintiffs' *Task Force Saber Videotapes* which has deprived Plaintiffs of licensing fees.

93.    Sending a copy of Plaintiffs' highly proprietary *Videotapes* to a third party goes far beyond the scope of the fair use defense.  Indeed, AP specifically offered them for sale, sold them as their own, and altered them; making derivative works in violation of law.

94.    The unauthorized copying and retransmission of Plaintiffs' *Task Force Saber Videotapes* to persons in other countries only magnifies the harm that AP' has caused to Plaintiffs.  AP purposely failed to embed their logo from broadcasts to allow widespread use by other news organizations, without being able to trace the footage back to AP, and thereby create a false defense of fair use.

# CAUSES OF ACTION

**1ST CLAIM FOR RELIEF – BREACH OF CONTRACT** 29

**2ND CLAIM FOR RELIEF –**
**TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE** 29

**3RD CLAIM FOR RELIEF –**
**TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS** 30

**4TH CLAIM FOR RELIEF – CIVIL CONSPIRACY** 31

**5TH CLAIM FOR RELIEF – FRAUD** 31

**6TH CLAIM FOR RELIEF – UNFAIR AND DECEPTIVE TRADE PRACTICES** 32

**7TH CLAIM FOR RELIEF – DEFAMATION** 33

**8TH CLAIM FOR RELIEF – BREACH OF CONFIDENCE** 35

**9TH CLAIM FOR RELIEF – CONVERSION** 35

**10TH CLAIM FOR RELIEF – NEGLIGENT MISREPRESENTATION** 36

**11TH CLAIM FOR RELIEF – COPYRIGHT INFRINGEMENT**
CONTRIBUTORY COPYRIGHT INFRINGEMENT 36

## FIRST CLAIM FOR RELIEF
### BREACH OF CONTRACT

95.    Plaintiffs incorporate by reference each and every paragraph contained in this herein Complaint.

96.    Plaintiffs and Defendants had a series of valid contracts and implied contracts.  Defendants repeatedly and wantonly breached the terms of those contracts as set forth herein.

97.    These breaches of contract were material breaches that substantially defeated the purpose of the agreements and struck at the very heart of the agreements, and in some cases were both a violation of contract and/or a failure to perform.

98.    Defendants' actions constitute a breach of the agreements and contracts between Plaintiffs and defendants under the laws of North Carolina, and Afghanistan.

99.    As a direct and proximate result of this breach of contract, Plaintiffs have suffered, and will suffer, damages.  Plaintiffs' damages exceed $10,000, exclusive of costs and interest.

## SECOND CLAIM FOR RELIEF
### TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

100.    Plaintiffs incorporate by reference each and every paragraph contained in this herein Complaint.

101.    Plaintiffs had economic relationships with each of the major US news networks, and numerous foreign news networks, all of which were ongoing and had resulted in past economic benefits to Plaintiffs in support of their anti-terrorism efforts, and were fully expected to result in future economic benefits to Plaintiffs.

102.    AP had knowledge of most if not all of these business and economic relationships between Plaintiffs and third parties.

103.    The intentional acts of AP, as set forth throughout this complaint, such as the false statements related to innocent men hanging upside down and other false accusations of outrageous conduct, were intentional acts by AP designed to disrupt the relationships

between Plaintiffs and third parties and which did in fact disrupt these relationships, causing economic harm to Plaintiffs.

104.    Furthermore, by withholding knowledge of exculpatory evidence, falsely reporting the facts of Idema's Afghan criminal case, making false and unsupported statements, repeatedly misquoting pro-Idema sources, and distorting those events between July 2004 and June 2007, negligently and with reckless disregard for the truth, AP induced third parties, including other news agencies to refrain from entering into licensing contracts with Plaintiffs.  Since July 2004, Plaintiffs' licensing of their *8mm VideoX al-Qaida Terrorist Training Tapes* to U.S. news networks has virtually ceased because of Defendants' false allegations against Idema.  Had it not been for AP' intentional acts these contracts would have continued and/or ensued.

105.    AP' actions constitute a tortious interference with the economic advantage of Plaintiffs under the laws of North Carolina and an interference with economic gain under the laws of Afghanistan.

106.    As a direct and proximate result of this wrongful interference, Plaintiffs have suffered, and will suffer, damages.  Plaintiffs' damages exceed $10,000 exclusive of costs and interest.

### THIRD CLAIM FOR RELIEF
### TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS

107.    Plaintiffs incorporate by reference each and every paragraph contained in this herein Complaint.

108.    Plaintiffs had legally binding contracts with major news networks. Defendants' false reporting of events caused networks to violate their contracts. Defendants' actions constitute a tortious interference with contract under the laws of North Carolina, and disruption of contract under the laws of Afghanistan in that Defendants' false statements and false reporting caused others to violate their contracts with Plaintiffs.

109.    As a direct and proximate result of this wrongful interference with contract, plaintiffs have suffered, and continue to suffer, damages.  Plaintiffs' damages exceed $10,000 exclusive of costs and interest.

## FOURTH CLAIM FOR RELIEF
### CIVIL CONSPIRACY

110.    Plaintiffs incorporate by reference each and every paragraph contained in this herein Complaint.

111.    AP, and their agents and employees, and each of them, entered into a conspiracy to engage in the wrongful conduct complained of herein, and intended to benefit both individually and jointly from their conspiratorial enterprise.  AP and their employees were jointly aware of the others acts, and the acts of their agents in furtherance of the conspiracy, and benefited therefrom.

112.    The purpose of the conspiracy was to intentionally violate the contracts between AP and Plaintiffs and exercise dominion and control over property to which AP had no rights and deprive Plaintiffs of income derived from their *Task Force Saber Videotapes*, thereby injuring Plaintiffs for AP' own profit and gain.

113.    Further, to intentionally report the news falsely, and withhold exculpatory information for the purpose of concealing evidence and facts related to Idema's innocence, thereby damaging Plaintiffs.

114.    As a direct and proximate result of AP's conspiracy and fraudulent misrepresentations, Plaintiffs have suffered damages in excess of $10,000 exclusive of cost and interests, plus punitive damages, under the laws of North Carolina.

## FIFTH CLAIM FOR RELIEF
### FRAUD

115.    Plaintiffs incorporate by reference each and every paragraph contained in this herein Complaint.

116.    AP, and their agents, repeatedly made false statements and assurances and Plaintiffs relied on those statements and assurances to their detriment and loss.

117.    On numerous occasions AP made intentionally false statements intended to deceive Plaintiffs.

118.    AP knew or should have known that the statements they made to plaintiffs, and those statements relayed to Plaintiffs, were false.  AP made these statements intending for the Plaintiffs to rely upon them.  Plaintiffs reasonably relied upon these statements.

119.    AP' false representations and/or concealment of material facts, were reasonably calculated to deceive, were made with the intent to deceive, and did in fact deceive, which resulted in damage to Plaintiffs.

120.    As a direct and proximate result of AP' fraudulent misrepresentations Plaintiffs have suffered damages in excess of $10,000 exclusive of costs and interest, plus punitive damages, under the laws of North Carolina.

## SIXTH CLAIM FOR RELIEF
### UNFAIR AND DECEPTIVE TRADE PRACTICES

121.    Plaintiffs incorporate by reference each and every paragraph contained in this herein Complaint.

122.    AP was at all times relevant to this matter, acting in and affecting commerce. AP operates news and television broadcast businesses, and have used those businesses and their misrepresentations to wrongfully usurp and deprive Plaintiffs of their *Task Force Saber Videotapes* and assume the financial benefits of Plaintiffs' videos for AP' own use, thereby benefiting third parties, for wrongful purposes.

123.    AP' continued misrepresentations were unethical and/or unscrupulous and were deceptive not only because they had the tendency to deceive, but did in fact deceive. As a direct result of their actions, Defendants have damaged Plaintiffs, and are liable to Plaintiffs for those damages. These unfair and deceptive trade practices caused extensive harm to Plaintiffs by subverting and interfering with Plaintiffs' sale and licensing of their *8mm VideoX al-Qaida Terrorist Training Tapes to* broadcast agencies around the world.

124.    AP' actions constitute unfair and deceptive trade practices in violation of Chapter 75 of the North Carolina General Statutes.

125.    As a direct and proximate result of AP' unfair and deceptive trade practices Plaintiffs have suffered damages far in excess of $10,000 exclusive of costs and interest, and treble and/or punitive damages are especially warranted.

# SEVENTH CLAIM FOR RELIEF
## DEFAMATION

126.    Plaintiffs repeat and incorporate by reference, as if fully set forth, the allegations herein.

127.    AP intentionally misreported the facts of Idema's arrest in July 2004 and thereafter by repeatedly making and republishing false statements.

128.    In news reports which were broadcast on television and radio, and published in newspapers, magazines, and internet sites around the world, AP (1) made false, defamatory statements about Idema; (2) repeatedly published those statements to third persons; and (3) caused injury to Plaintiff's reputation through those statements.

129.    AP committed libel *per se*, by continually making numerous and repeated false statements, which AP knew were false.  These statements accused Idema of committing infamous crimes and impeached him in his trade and profession; and subjected him to ridicule, contempt and/or disgrace, and continued false imprisonment.

130.    AP falsely reported that Idema, Captain Brent Bennett, and Lieutenant Zorro Rasuli Banderas had abused eight prisoners and that Idema had the prisoners "hanging… by their feet."  Originally it was thought that AP attributed this to "anonymous" Afghan official sources to conceal the identities of Jalali and Mashal.  Even if that were fact, AP knew these sources were of questionable reliability and that this was untrue because AP had spoken to sources that had been in the Task Force Saber compound throughout that week and seen the conditions and treatment of the prisoners.  However, it was just recently learned that AP's anonymous source for the accusation of hanging prisoners upside down may not have even existed, and it is alleged that it may have been simply a figment of Amir Shah's vivid imagination.  In March 2007, Shah confided in an Afghan that his description of torture victims hanging upside down was based on a scene in an Indian Bollywood film that had been released in Afghanistan just prior to his articles.  Shah also said that he thought Americans could identify with this because he had seen evidence of Americans hanging prisoners from the ceiling in another film—The Punisher, which had come out just

weeks before.  Unfortunately, Shah's beliefs were based upon Hollywood fiction derived from the adaptation of a comic book.  It would be difficult to believe that the other individual Defendants did not have knowledge of this fabrication.

131.    In spite of AP' knowledge that the statements were false, AP printed and published statements, and caused statements to be reprinted and republished around the world, such as: a) "…Afghans who said they had been tortured as part of the Americans' freelance hunt for terrorists," b) "prisoners have told the court they were beaten, burned with scalding water and deprived of food and sleep," c) a taxi driver said "his head was forced repeatedly" underwater, d) "and that he was beaten on the feet and stomach.  He said he was fed two pieces of bread in seven days," and that e) another said he "was also beaten."

132.    AP reported that one terrorist who confessed, named Ghulamsaki, claimed; "It's not true.  They put hot water on my body and tortured me and that is why I made these statements."  AP knew those statements were false.

133.    In their continuing quest to discredit Idema after his arrest, AP stated that Idema was a "purported former Green Beret who claims to have links with Afghan militia forces."  AP knew that this was false.  AP also knew that Idema WAS officially working with and for the United Front Military Forces for four years, yet they stated that Idema "claimed" to work with Afghan militia forces, thereby subjecting something AP knew was fact to doubt.

134.    AP used their stories to impeach Idema's *8mm VideoX Terrorist Training Tapes* which show al-Qaida terrorists training at a terrorist training center in Mir Bacha Kot Afghanistan.  By writing these stories, Defendants impugned the credibility and authenticity of the *8mm VideoX Terrorist Training Tapes,* thereby subjecting them and Idema to doubt as to their credibility.

135.    AP' statements were made negligently and with a reckless disregard for the truth.  Further, AP acted knowingly and intentionally, with constitutional malice, continuing their false reports which were repeated time and again by other news agencies

when in fact AP had a legal and ethical obligation to present a true and accurate report to the public.

136.    As a direct and proximate result of AP' false statements above, made negligently and with reckless disregard for the truth, Plaintiffs have suffered damages in excess of $10,000 exclusive of costs and interest, plus punitive damages, including special damages and presumed damages, under the laws of North Carolina.

## EIGHTH CLAIM FOR RELIEF
### BREACH OF CONFIDENCE

137.    Plaintiffs incorporate by reference each and every paragraph contained in the herein Complaint.

138.    Defendants and Plaintiffs entered into a confidentiality agreement and contract.  That agreement prohibited Defendants from using, publishing, distributing, or selling, any of the images or video obtained in confidence unless Defendants properly licensed it.  Defendants violated this confidence.

139.    As a direct and proximate result of Defendants' violations of the confidentiality agreements and breaches of confidence, Plaintiffs have suffered damages in excess of $10,000 exclusive of costs and interest, plus punitive damages.

## NINTH CLAIM FOR RELIEF
### CONVERSION

140.    Plaintiffs incorporate by reference each and every paragraph contained in the herein Complaint.

141.    Defendants used Plaintiffs' proprietary images and video and distributed these images to third parties for their own profit and benefit. Defendants engaged in conversion because the *Task Force Saber Videotape* was an original and Defendants failed to copy and return it to Plaintiffs' attorney in violation of the agreement, thereby depriving Plaintiffs of the property.

142.     As a direct and proximate result of the Defendants conversion of Plaintiffs original proprietary materials, Plaintiffs have suffered damages in excess of $10,000 exclusive of costs and interest, plus punitive damages, including special damages.

## TENTH CLAIM FOR RELIEF
### NEGLIGENT MISREPRESENTATION

143.     Plaintiffs incorporate by reference each and every paragraph contained in the herein Complaint.

144.     The bulk of the statements made by Defendants constituted fraud, other statements, and those falling outside intentional fraud and/or constructive fraud, were negligent misrepresentations.

145.     Those statements which may not have been intentional were made by Defendants in the course of their business and profession.  Defendants failed to exercise the care and competence in communicating that information that Plaintiffs justifiably expected.

146.     The duty owed by Defendants was a greater scope of duty in that they had a public duty to provide accurate and truthful information.

147.     As a direct and proximate result of Defendants misrepresentations Plaintiffs have suffered damages in excess of $10,000 exclusive of costs and interest, plus punitive damages, against each of the Defendants, both jointly and severally.

## ELEVENTH CLAIM FOR RELIEF
### COPYRIGHT INFRINGEMENT – CONTRIBUTORY COPYRIGHT INFRINGEMENT

148.     Plaintiffs incorporate by reference each and every paragraph contained in the herein Complaint.

149.     Defendants, as set forth herein, have directly violated the copyrights of Plaintiffs and contributed to the copyright infringement of Plaintiffs' images and video by other third parties by distributing those materials to their clients.

150.     As a direct and proximate result of Defendants copyright infringement and/or contributory copyright infringement, Plaintiffs have suffered damages in excess of $10,000 exclusive of costs and interest, plus statutory damages, against each of the Defendants, both jointly and severally.

## INJUNCTIVE RELIEF (RULE 65) FOR ORDER RESTRAINING DEFENDANTS FROM POSSESSING OR BROADCASTING PLAINTIFFS' VIDEO TAPES

151.    Plaintiffs incorporate by reference each and every paragraph contained in this herein Complaint.

152.    Plaintiffs pray for a Preliminary Injunction preventing defendants from utilizing Plaintiffs' *Task Force Saber Videotapes* or using pictures of Idema, or information from Idema, until such time as a jury renders a decision in this case, or until such time as this case has been discontinued for good cause.

153.    Additionally, Plaintiffs pray for a Temporary Restraining Order, and will be subsequently filing a motion under Rule 65 (b) (N.C.R.Civ.P.) asking this Honorable Court to enter an Order preventing AP from releasing or broadcasting copies of Plaintiffs' images until such time as this court can hear oral argument and review the supporting affidavits attached to Plaintiffs' motion.

154.    Without such protections Plaintiffs will suffer irreparable and irreversible harm, loss, and damage, and, if Plaintiffs were to prevail in this action, the absence of such preliminary injunction could adversely affect a third party which might unknowingly broadcast or use Plaintiffs' video without notification of this litigation.

155.    Plaintiffs are prepared to provide a security bond or payment in such sum as the Court deems proper for the payment of such costs and damages as may be incurred or suffered by AP should they be found to have been wrongfully enjoined or restrained. However, Plaintiffs assert that defendants will suffer no damage by withholding Plaintiffs' video from distribution and/or broadcast until the conclusion of this case.  The provisions of N.C.R.Civ.P. Rule 65.1 would apply to a surety upon a bond or undertaking under this rule should the Court issue an Order as set forth above.

## PRAYER FOR RELIEF

**WHEREFORE,** Counterr Group and Idema pray that this Honorable Court enter judgment in their favor and against the AP Defendants as follows:

1.  Awarding Plaintiffs damages in excess of $10,000 against Defendants pursuant to each of the claims for relief.

2.  Awarding Plaintiffs punitive damages pursuant to the fifth and sixth claims for relief.

3.  Awarding Plaintiffs treble damages, and attorneys' fees against the AP Defendants pursuant to the sixth claim for relief.

4.  Awarding Plaintiffs special and presumed damages, corrective advertising, and attorneys' fees against the AP Defendants pursuant to the seventh claim for relief.

5.  Entering a Temporary Restraining Order pursuant to the seventh claim for relief as set forth below until such time as a preliminary injunction can be heard and placed in effect until this case is concluded;

(a) adjudge and declare, that the AP Defendants have contributorily and vicariously infringed Plaintiffs' exclusive rights under the contracts and agreements, and Plaintiffs' rights under North Carolina law;

(b) preliminarily and permanently enjoin, pursuant to Rule 65 (b) of the N.C. Rules of Civil Procedure, AP, their officers, agents, employees and those persons in active concert or participation with them, from directly, contributorily and/or vicariously violating Plaintiffs' rights under the agreements, including but not limited to, any use, exhibition, display or broadcast of Plaintiffs' *Task Force Saber Videotapes* or from licensing or allowing any other person to do the same;

(c) preliminarily and permanently enjoin AP from possessing any copies of Plaintiffs' *Task Force Saber Videotapes*;

(d) preliminarily and permanently enjoin, pursuant to Chapter 75 of the North Carolina General Statutes, AP, their officers, agents, servants, employees and those persons in active concert or participation with them, from engaging in one or more unfair and/or unlawful business acts or practices, including but not limited to, their possession, use, and/or display of Plaintiffs' *Task Force Saber Videotapes*, or pictures or video;

(e) require AP and their officers, agents, servants, employees and those persons in active concert to cease any activity that encourages others to violate Plaintiffs' exclusive

property rights in the *Task Force Saber Videotapes*, or that encourages or permits viewers or other news organizations to transmit or possess copies of Plaintiffs' *Task Force Saber Videotapes* to other persons;

(f) require AP to engage in corrective advertising specifying the source and ownership of the *Task Force Saber Videotapes*, and events related to Idema's case, and

6. Awarding Plaintiffs costs and interest against the AP Defendants and

7. Granting a trial for all issues that are triable.

Respectfully submitted, this 7th day of July 2007,

J. K. Idema, *Plaintiff*
12 Jonathan Lane
Poughkeepsie, NY 12603
Fax:        480/246-5626

For Counter Terrorist Group US, *Plaintiff*
PO Box 691, Fayetteville, NC 28302
Phone:        910/483-5506
Fax:        910/483-5507


John Edwards Tiffany,
Attorney (JT7322)
*Counsel For Counter Terrorist Group US*
Law Offices of John E. Tiffany P.C.
The Robert Treat Center
50 Park Place, 10th Floor,
Newark, New Jersey 07102
Tel:  (973) 242-3700
Fax: (973) 242-3799
www.JohnTiffanyLaw.com
Email: Jet@Jet4Law.com

## VERIFICATION

I declare under the penalties of perjury as follows, but expressly not limited thereto:

1.  The facts stated in the above complaint, are personally known to me and, if called as a witness, I could testify competently thereto, except to those facts stated under information and belief, which I believe to be true.

2.  Further Declarant sayeth not.

Executed under the penalties of perjury, in accordance with 17 U.S.C. §1746 on this 7th Day of July 2007.

J. K. Idema, *Plaintiff*

Thomas R. Bumback, being first duly sworn, deposes and says that he has authority to appear for the plaintiff, Counterr Group in the above action, that he has read the foregoing Amended Complaint and knows the contents thereof; that the same are true of his own knowledge except as to those matters and things stated upon information and belief, and as to those things, he believes them to be true.  Further Declarant sayeth not.  Executed under the penalties of perjury, in accordance with 17 U.S.C. §1746 on this 7th Day of July 2007.

Master Sergeant Thomas R. Bumback
US Special Forces (ret.)
For Counterr Group, *Plaintiff*
PO Box 691, Fayetteville, NC 28302-0691